IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 10, 2006 Session

## STATE OF TENNESSEE v. ROBERT L. MITCHELL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2005-A-241     Steve R. Dozier, Judge**

─────────────

**No. M2005-01652-CCA-R3-CD - Filed June 1, 2006**

─────────────

The defendant, Robert L. Mitchell, was convicted of especially aggravated kidnapping, two counts of aggravated kidnapping, and assault. Later, the two aggravated kidnapping convictions were merged. The trial court sentenced the defendant as a violent offender to twenty-five years for the especially aggravated kidnapping, twelve years for the aggravated kidnapping, and eleven months and twenty-nine days for the assault. Because the kidnapping sentences are to be served consecutively, the effective sentence is thirty-seven years. In this appeal of right, the defendant claims that (1) the evidence is insufficient to support his kidnapping convictions; (2) the trial court erred by admitting evidence of prior bad acts; and (3) his sentence is excessive. The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Jay Norman, Nashville, Tennessee (on appeal); Katie Weiss and Graham Prichard, Assistant Public Defenders (at trial), for the appellant, Robert L. Mitchell.

Paul G. Summers, Attorney General & Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dumaka Shabazz and Rachel Sobrero, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On February 4th and 5th, 2004, the defendant committed a series of acts against his wife, C.F.M.,[1] who was the primary victim of the crime, and his nine-year-old stepdaughter, B.R.S., which led to the various convictions. The events began at the family home in Davidson County, where the defendant had not resided for the previous three months, and ended at the residence of the defendant's brother, Michael Maynard, in Smith County.

### State's Proof

At trial, B.R.S. testified that on the morning of February 4, 2004, she was at home sleeping when she heard a "bang on the door" and screams from her mother. She recalled that as the defendant and her mother then entered her bedroom, the defendant exclaimed that "he was not there to hurt her, he was just there to come back to his family." When B.R.S. noticed that her mother's "head was hurt," the defendant pulled the plug from the telephone and warned, "If you try and call the police, I'm gonna snap your neck." B.R.S. described herself as crying and scared and described the defendant as mad and "yelling in a high tone." According B.R.S., the defendant ordered her to dress because they were "going for a ride." B.R.S. testified that her brother, B.M., and her sister, R.M., who were in separate bedrooms, also dressed and joined her and her mother, who had "blood all over her hands and face," in the living room. B.R.S., who said that she did not want to go with the defendant because she was fearful for herself and the others, got in the backseat of the sport utility vehicle. She recalled that as her mother and siblings also got into the vehicle, the defendant directed her to the cargo area of the vehicle where she went to sleep. Before falling asleep, however, B.R.S. overheard the defendant announce that her mother's parents were dead. She testified that when she awoke, she was at the home of her uncle, Michael Maynard. B.R.S. remembered that the defendant asked Maynard for a gun and that everyone spent the night at the house. She testified that she was in the living room with her mother, her siblings, and Maynard for "an hour or two" while the defendant slept. B.R.S. stated that her mother was still bleeding when they arrived at Maynard's house, but the defendant never took her to a hospital, and when the police arrived, he tried to run out the back door. B.R.S. testified that she had called the police on a prior occasion when the defendant had pointed a gun at her mother and her uncle.

Seven-year-old R.M., who on the date of the offense also heard a "bang" and her mother screaming and running, testified that the defendant, who was "[k]ind of mad" because her mother was not wearing her wedding ring, ordered her to get dressed. R.M. recalled seeing blood in the hallway and the bathroom and on her mother's face and also noticed that the front door of the house had been "kicked in and broken." She was in the back of the vehicle with B.R.S. as they traveled to Maynard's house. According to R.M., her mother was still bleeding when they arrived at Maynard's residence and the defendant told them to go inside, where they watched television. She recalled that the defendant whispered to her that when he found a gun, he intended to shoot her mother and himself. R.M. testified that she told her mother what the defendant had said and that her mother later made dinner for everyone at Maynard's house, where they spent the night.

---

[1] Because of the sensitive nature of this case, the victims and the minor children will be referred to by their initials.

The victim testified that the defendant had not lived in their Nashville residence since November 2003 and that she had paid the mortgage and the utility bills. She stated that she thought the defendant was living with his mother. The victim testified that she was awakened at 5:00 a.m. on February 4, 2004, which was a school day, when she heard "a big bang" and saw the defendant enter the doorway. She recalled that she screamed because she knew the defendant "was there to kill [her]." She explained that he had repeatedly threatened to do so if she ever left him and also warned that "he would hang [her] from a tree and tie a tire around [her] neck and burn it, so it would melt over [her] body; and then he would burn [her] to ashes, to where nobody could ever find [her]." According to the victim, the defendant forcefully put his hands over her mouth to stop her screams and then said in a sarcastic tone of voice, "Hi, honey, I'm home." She described the defendant as having glazed, red eyes with his veins "popping out of his temples." She testified that the defendant gripped her and directed her to B.R.S.'s room, explaining that he wanted to see his children, that he was not there to hurt her, that he still loved her, and that he was still wearing his wedding ring. The victim recalled that when the defendant then asked why she was not wearing her wedding ring, she answered that she had taken it off the previous night prior to a domestic violence group meeting. She recalled that the defendant responded by calling her a "f[***]ing bitch" and hitting her in the face. According to the victim, the defendant repeatedly asked why she had taken off her ring and if she was dating anyone. She stated that he then walked over to the caller identification box to scroll through the list of callers, intermittently asking, "Who's this person? Is this somebody you're f[***]ing? Who is this person? I don't know this person." The victim testified that the defendant jerked the telephone out of the wall and warned B.R.S. not to call the police, warning that he would otherwise "snap [her] neck." She recalled that the defendant grabbed her by the back of her hair, forced her down the hallway, and slammed her head into a nail in the wall, which pierced her forehead. The victim stated that the defendant's anger escalated and that he called her "a whore."

The victim testified that when she went to the bathroom to clean her head wound, the defendant followed, continuing to badger her with the question, "Who are you f[***]ing?" She stated that the defendant digitally penetrated her, smelled his hand, and then repeated the same question again. According to C.F.M., the defendant again asked her about her missing wedding ring and, dissatisfied with her answer, called her "a f[***]ing liar" and hit her in the face. She described the children, who were ages nine, six, and two at the time, as crying and scared. She recalled that when the defendant ordered them to get dressed to go for "a little ride," the three children all dressed hurriedly, not even taking time to put their shoes on even though it was February. The victim explained that she was unable to take her purse with her because the defendant had "his grip" on her arm. She testified that the defendant directed B.R.S. and R.M. to move to the back cargo area of the vehicle and lie down as he continued to question the victim about who she was dating. She stated that as he was driving, the defendant hit her in the eye and then demanded that she perform oral sex on him. She recalled that when she at first refused, the defendant remarked, "You got three seconds, bitch, or you [won't] have any teeth." The victim testified that she complied with the defendant's demand even though her head was still bleeding and her children were in the car. She recalled that when she asked the defendant where they were going, he replied, "I told you, bitch, what I would do to you, if you ever left me. . . . I've killed your parents. I've decapitated them. I've already been to their house. . . . Now, I'm taking you to where they're at to lay you down beside them."

According to the victim, the defendant drove to his brother's residence and upon his arrival, announced, "[L]ook what I've done to this bitch. I'm coming to f[***]ing kill her. This f[***]ing whore has taken her ring off. I'm gonna kill this bitch." She testified that the defendant then asked Maynard for his gun, continued to threaten to kill her, and at one point said, "[I]f you don't give me a gun, I'll find another way to kill her. I'll beat her head in with a hammer. I'll take a can of corn and put it in a pillowcase, or I'm gonna tie her to the back of that truck and I'm gonna pull her behind the truck, like they did that n[****]r in Texas." The victim recalled that the defendant then grabbed her arm and took her to a bedroom where he "punched" her in the chest and demanded that she remove her clothes. She testified that when Maynard entered the bedroom and she motioned for help, he left the room without offering assistance. She stated that when the defendant forced her to have sex, she became weak, vomited, and developed a migraine headache for which the defendant supplied Lortab. The victim testified that Maynard offered her the keys to his truck but warned that the truck might not start and suggested that the defendant might run her off the road because he still had the keys to their vehicle. The victim explained that she tried to think of ways to escape, but because it was raining and neither she nor the children had any coats or shoes, she did not do so. She expressed fear of calling 911 because the defendant might find out. She recalled that they were at Maynard's house "[t]hat whole day and most of the next day."

The victim testified that she did call her workplace shortly after her abduction and left a message that she was sick and would not be in to work. She pointed out that the defendant "was standing right there and that's what he told me to say." She also telephoned her mother at the direction of the defendant, telling her that she was sick and was not bringing the children to her house which was her normal practice. The victim later called the defendant's aunt, Sandy Brooks, and told her that the defendant had hurt her, that she had been bleeding all day and needed help, and that she and the children were afraid for their lives. She testified that the defendant also talked to Ms. Brooks and said, "Get somebody out there to clean up the blood, before somebody finds it."

The victim recalled that on the following morning, Maynard handed her the telephone and told her to call Ms. Brooks, who then placed a three-way call to the victim's parents. She stated that she again told her parents that she was sick and was not bringing the children to their house. She explained that she did not tell her parents to call the police "[b]ecause I had already heard [the defendant] say that he was gonna take me to Louisville, Kentucky, and because I was in fear of my life. I figured he would go ahead and kill me or take off with one of the children." The victim contended that she was never allowed to use the telephone alone but that she also talked to the defendant's cousin, Jennifer Reed, and asked her to come to help her. According to the victim, Ms. Reed agreed to help but never arrived. She testified that the ordeal finally came to an end when the defendant took a nap and Maynard asked her if she wanted him to call the police. She recalled that the police arrived soon thereafter and placed the defendant in custody. While acknowledging that the defendant "didn't spend all his time watching [her]" at Maynard's house, she explained that she left her residence with the defendant only "[b]ecause I thought he was gonna kill me, and I was afraid for my life. I thought, maybe, if I cooperated with him and did what I was told, instead of fighting him, that there was a possibility that I would live."

-4-

On cross-examination, the victim maintained she never saw the defendant sleep during the ordeal. She acknowledged that she had been in the living room with Maynard and the children for about thirty minutes while the defendant was in another room and that Maynard had not restrained her from using the telephone. She did claim, however, that Maynard told her that the defendant had directed him to watch the telephone. The victim, who acknowledged that her head wound did not require stitches, recalled that the defendant took the car keys when he arrived at the Maynard residence. She testified that she chose not to call out to Maynard's neighbors out of fear.

When asked if B.R.S. had ever called the police before, the victim related an incident that occurred in February 2003 at her parents' house when the defendant, in an effort to reconcile a separation, pushed her brother off the porch into the driveway. She recalled that when a gun fell from the coat pocket of her brother, the defendant grabbed the gun, aimed at her brother, and pulled the trigger, but the gun did not discharge. She testified that the defendant then pointed the gun at her head and said, "Now, bitch, you're going with me." She stated that she refused to go with the defendant and held onto the porch railing as the defendant "pulled at [her], trying to get [her] loose; pulled [her] shirt off, ripped it completely off of [her]." The victim related that when her father intervened, the defendant went to his truck, held the gun out the window, and warned her that if she did not go with him, he was going to shoot himself. She stated that B.R.S. called the police on this occasion but acknowledged that the charges against the defendant were ultimately dismissed.

The victim also testified about a prior incident when she failed to meet the defendant for lunch at her workplace. She stated that as soon as she saw his face, she knew she "was gonna get it" and the defendant hit her several times in the face, leaving her with bruises, a black eye, a broken blood vessel in her eye, and a cracked tooth. She recalled that the defendant refused to let her go back to work that day and took her home instead. She acknowledged that no criminal charges were pressed against the defendant for this incident.

Officer Stan Goad of the Metropolitan Nashville Police Department was dispatched to the victim's home on February 5, 2004, arriving at approximately 9:00 a.m. After speaking to the victim's parents, the officer observed blood in the bathroom and hallway, a hole in the wall in the hallway, and a broken door frame.

Detective Bruce Pinkerton, who also responded to the dispatch, described the residence: "The front door was pretty much off the hinges. The door facing was laying inside on the floor. I noticed what appeared to be blood droppings, when I first walked in; and they led all through the house. There was an indent[at]ion in the drywall in the hallway." He testified that a telephone appeared to have been "snatched" from the wall in a child's bedroom. Detective Pinkerton talked to the victim's father and telephoned the defendant's aunt, Sandy Brooks, in an effort to locate the victim. He recalled that about thirty minutes later, Ms. Brooks returned the call with the victim on the line. The detective testified that the victim said she was all right "in a faint voice" and informed him that the defendant was with her. According to the detective, he then spoke with the defendant who said, "We don't need the police. We're trying to get our life together." Detective Pinkerton, who was unable to determine from the conversation the whereabouts of the victim, was given

-5-

Maynard's telephone number by Ms. Brooks; when he called back, however, he did not get an answer. The detective then called the Smith County authorities and asked them to check for the victim at Maynard's residence. Detective Pinkerton later learned that the victim, the defendant, and the children were at Maynard's house. Detective Pinkerton said he talked to the victim two or three days later and she gave a ten-page, written statement of what had occurred. He had no recollection of the victim telling him during the interview that the defendant had digitally penetrated her.

Joyce Sullivan, the victim's mother, who babysat for the victim's youngest child, testified that in February 2004, the victim typically brought the children to her house every morning, where the older ones would catch the school bus. She stated that when the victim did not bring the children on February 4, 2004, she talked by telephone to the victim "for just about a minute" and then talked to her again the next day. Mrs. Sullivan recalled that when she told the victim that she was coming to get the children because they had missed enough school, the victim responded in a whisper from which she inferred "something was terrible wrong." Mrs. Sullivan testified that she and her husband drove to the victim's residence where they discovered the broken front door, a "hole in the wall," and blood in the kitchen, living room, hallway, and bathroom. Mrs. Sullivan stated that she saw the children's shoes and coats in the living room and "wondered why they went out in the cold" without them. She recalled that she telephoned Sandy Brooks, who returned her call five to ten minutes later with the victim on the line. Mrs. Sullivan stated she could barely hear the victim on the telephone and that she sounded like she was "down in a barrel." Mrs. Sullivan testified that the police were called and given Maynard's name.

Smith County Sheriff's Department Deputy Steven Cowan testified that on February 5, 2004, he was dispatched to Maynard's residence, arriving between 2:00 and 2:30 p.m., to "investigate a female being held against her will." He indicated that he first saw Maynard, who directed him to the back of the house where he found the victim and the defendant. He described the victim as "very disoriented" and "afraid," and he noticed bruises and marks on her forehead and eye. He pointed out that when he asked the victim a question, the defendant tried to answer and he recalled that the victim began to answer his questions only after she was separated from the defendant. He stated that the victim told him that she was being held against her will and wanted to leave.

Smith County Deputy Ronnie Nelson Smith, who also responded to the scene at Maynard's residence, testified that he found blood on the defendant's right arm and chest area and a mark and abrasions on the victim's head. He stated that the defendant was "somewhat calm" but that the victim was sitting with her head down, avoiding eye contact with the officers. Deputy Smith confirmed that every time the officers asked the victim a question, the defendant "would blurt something out . . . try to answer a question." He testified that the defendant was arrested and transported to the sheriff's department.

**Defense Proof**

Ms. Reed, the defendant's cousin, testified as a defense witness. She claimed she had called Maynard on the evening of February 4, 2004, and, when she heard children playing in the

background, asked him who was there with him. She recalled that Maynard informed her that the defendant, the victim, and their children were there, and that when she then talked to the defendant, he was crying and "very upset." She claimed that she also talked to the victim, who, she observed, "did not sound upset at all in any way," telling her everything was "okay." Ms. Reed denied that the victim had asked her for help.

Michael Maynard, the defendant's brother, testified that on the morning of February 4, 2004, the defendant, the victim, and their children came to his house around 6:30 or 7:00 a.m. He recalled that he put his "guns and everything up, because of the small children" and because the defendant and the victim were arguing. Maynard stated that he invited all of them inside and that he then learned that the defendant had apparently found another man in the victim's house. He testified that the victim was bleeding and had "a little hole" in her head "like a pimple been's popped." He denied that the defendant admitted ramming her head into a wall. Maynard stated that he and the children watched television while the defendant and the victim went to the back bedroom. He claimed that when he heard a noise, he went to the bedroom and saw that both the defendant and the victim had removed their pants. He then heard the victim say, "Not like this." He denied that the victim asked him for help. Maynard testified that he then returned to the living room, and the defendant and the victim subsequently joined him there. Maynard claimed that the defendant fell asleep around 9:00 a.m. in one of the bedrooms and slept "ninety percent of the time" he was there. He contended that he offered the victim the keys to either of his two trucks, which were in working condition, and insisted that she could have left if she had wanted. He confirmed that the defendant and the victim had arrived in the defendant's vehicle and that the defendant had said he was not going to let her take the car. He testified that he offered the victim a Lortab, which she took "around evening time," and that the victim was allowed to use the telephone. Maynard denied that he left the house while the defendant and the victim were there and refuted the claim that the defendant had asked him for a gun. He acknowledged that he talked to his father, Jerry Maynard, and his cousin, Jennifer Reed, by telephone and that Sandy Brooks, who lived in Davidson County, called and informed him that a detective was trying to reach them.

Maynard acknowledged that on the second day of the defendant's stay at his residence, the victim told him that the defendant had touched her inappropriately. He also admitted that in his initial statement to the police, he had stated that the defendant had rammed the victim's head into a wall with a nail but did not mean to do so. He also acknowledged that the defendant expressed a desire to return to Nashville to clean up the blood at the victim's residence. Maynard contended that he could not remember if the victim was wearing shoes when she arrived at his house but he did acknowledge that he gave her some house slippers to wear when they went to the sheriff's department.

The defendant testified that just before the events leading to his convictions, he had been in jail for two and a half months on allegations of aggravated burglary made by the victim's parents. He claimed that the victim and the children had visited him in jail and that he spoke to the victim on the afternoon of February 3rd before he made bail. He denied that the victim had asked him not to come home after his release and claimed that all of his belongings were at the victim's house. He

stated that his younger brother picked him up at the jail and that they went to his brother's house in Madison. The defendant claimed that he walked fifteen miles to the victim's house and arrived there between 5:30 and 6:00 a.m. He contended that when he realized that all of the locks had been changed and a deadbolt had been placed on the front door, he knocked on the door and, when no one answered, he saw through a window that the victim was with a man. He admitted that he kicked in the front door and claimed that the man tried to hide. He asserted that when he ran after the man, he pushed the victim out of the way, accidentally knocking her into the wall. The defendant claimed that he and the man "scuffled," but the man "got loose and r[a]n out the door." The defendant acknowledged that he hit the victim in the eye and conceded that the injuries to her eye and chin could not have been caused by one punch.

The defendant admitted that the victim's head was bleeding and that she went to the bathroom to wash off the blood. He denied that he digitally penetrated her while they were in the bathroom. The defendant acknowledged that he asked the victim why she was not wearing her wedding ring and why she had a man there, and asserted that she replied, "He's just a friend." The defendant stated that he then started scanning the caller identification box in B.R.S.'s room and asked the victim about certain telephone numbers. He acknowledged that he "threw" the caller identification box but denied that he ripped the telephone from the wall or threatened to snap B.R.S.'s neck if she called the police. He claimed that he and the victim then went to the living room and the children followed. He admitted that he told the victim to get B.M. dressed and that he directed R.M. to get dressed because he was "taking them and leaving." The defendant stated that B.R.S. was not his daughter and that he did not require her to go with him. He contended that he picked up B.M. and headed out the door, and the victim followed, saying, "You're not taking the kids without me." He stated that he put B.M. and R.M. in his vehicle and that the victim and B.R.S. got in after him. He acknowledged that he and the victim were arguing but denied that he told her that he had killed her parents or had threatened to kill her. The defendant denied that he hit the victim while he was driving but acknowledged that he asked her to perform oral sex on him.

The defendant stated that he then drove to Maynard's house, who asked what had happened and invited them inside. The defendant claimed that the victim then voluntarily called her employer and her mother. He testified that he and the victim later went to a bedroom while the children watched television and that when he asked to have sex, she replied, "No, not like this. It's not right." The defendant claimed that when he said, "Yeah, let's do it," and removed his pants, the victim also removed her pants. The defendant acknowledged that Maynard came into the room while they were having sex and asked if everything was all right. He stated that he and the victim then returned to the living room. He said that he later went to a bedroom where he slept until about 7:00 p.m. The defendant acknowledged that he talked to his cousin, Jennifer Reed, by telephone outside on the deck and that he was crying and upset during their conversation. He stated that Ms. Reed then spoke to the victim outside his presence. The defendant denied that he held the victim against her will and claimed that his only intention was to take his children, B.M. and R.M., to Maynard's house.

The defendant testified that when Detective Pinkerton called the next day, he explained that the victim's parents had "tried to make something really bad outta this." He recalled that he went

back to sleep and was later awakened by Maynard, who told him the police were there. The defendant confirmed "what happened" and that when Officer Cowan asked the victim if she wanted to press charges, he shook his head, "like, 'Don't do this, man. . . . We done been through this . . . a hundred times.'" The defendant claimed that when he was taken into custody, he thought the charges against him were for "domestic assault, because [the victim] had a knot on her head and a black eye." The defendant denied having told R.M. that if he found a gun he would kill the victim, claiming someone had "brainwashed" his daughter into saying that. The defendant denied that he had planned to take the victim across state lines and denied telling Maynard he wanted to clean up the blood at the victims' house.

The defendant also testified about the 2003 incident at the Sullivans' home, claiming that he tried to hug the victim as she pushed him away. He stated that the victim's brother threatened to get his pistol if the defendant did not leave, else he was going to shoot him. According to the defendant, he pushed the victim's brother when he returned two minutes later with a pistol. The defendant claimed that because he was in danger, he grabbed the gun, pointed it at the victim's brother, and grabbed the victim, asking her to go with him. He claimed that the victim's father then grabbed her by the shirt and pulled her away from the defendant, tearing her shirt in the process. The defendant insisted that he then went home and the victim later informed him he would be arrested for "pulling that gun on [them]."

**Sentencing Hearing**

The victim testified that she and the children had received counseling as a result of the ordeal with the defendant and had moved. She stated that she still experienced fear and paranoia and has nightmares about the defendant almost every night. She said that she wanted the defendant to serve the maximum time for the crimes he committed. She testified she has to constantly reassure the children that they are safe and contended that the defendant had threatened her on the day of his arrest, saying that even "if he served twenty years, that he would still find [her] and kill [her]."

Joyce Sullivan testified that "the whole thing has just been a trauma and a nightmare." She stated the incident had traumatized her grandchildren very much and that they are "totally different." She related an incident when the defendant pulled a gun on her husband and the victim and knocked her down on the porch. She explained that her husband had counseled with the defendant that day and had tried to get him into a drug rehabilitation program. She testified that afterward, she felt "terrible terror everyday until [the defendant] was arrested." She acknowledged that she and her husband previously had talked to the defendant about undergoing an exorcism and acknowledged that an attempted exorcism had been performed on the defendant.

Robert Willard Mitchell, the defendant's father, testified that he had a close relationship with the defendant. He said that B.R.S. called the defendant "Daddy" and that the defendant did not treat her any differently than his two biological children. He acknowledged that the defendant and the victim argued "from time to time" and that he had seen a bruise on the victim's face and a bite on the defendant's chest. He denied, however, that he had ever seen them in a physical altercation. He

-9-

claimed that both the defendant and the victim had used illegal drugs and asserted that the defendant had supported his family prior to his incarceration. Mitchell said that he did not believe the defendant had intended to hurt the victim, saying the defendant "just didn't want to lose his wife, his family and his home."

Jennifer Reed, the defendant's cousin, testified that the defendant and the victim married when B.R.S. was "just a baby." She described the defendant as "one of the finest fathers I've ever known. . . . I've never seen him be verbally or physically abusive to any of his children."

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first argues that the evidence was insufficient to support either of the kidnapping convictions. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

### A. Especially Aggravated Kidnapping (Count 1)

Especially aggravated kidnapping is defined as a false imprisonment "[w]here the victim was under the age of thirteen (13) at the time of the removal or confinement." Tenn. Code Ann. § 39-13-305(a)(2) (2003). False imprisonment is defined as the "knowing removal or confinement of another so as to substantially interfere with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2003).

In this case, B.R.S., who was only ten years old at the time trial, testified that she was awakened by defendant beating on the door and her mother screaming. She noticed that her mother's head was injured and recalled that the defendant threatened her, saying, "If you try and call the police, I'm gonna snap your neck," and then jerking the telephone out of the wall. The victim corroborated that testimony. B.R.S. expressed fear of the defendant, who appeared angry and ordered her to get dressed. Before leaving, B.R.S. saw that her mother had "blood all over her hands and face." Later, she heard the defendant tell her mother that her grandparents were dead. Under

-10-

these circumstances, it is our view that the evidence was sufficient to support the conviction for the especially aggravated kidnapping of B.R.S.

## B. Aggravated Kidnapping (Count 2)

Aggravated kidnapping is defined as false imprisonment "[w]ith the intent to inflict serious bodily injury on or to terrorize the victim or another" or false imprisonment "[w]here the victim suffers bodily injury." Tenn. Code Ann. § 39-13-304(a)(3), (4) (2003). As previously stated, false imprisonment is defined as the "knowing removal or confinement of another so as to substantially interfere with the other's liberty." Tenn. Code Ann. § 39-13-302(a).

The victim had "blood all over her hands and face" when first seen by B.R.S. after the break-in. The victim testified that the defendant slammed her head into a wall. A nail pierced her forehead. The defendant admitted that he kicked the door in and pushed her into the wall. According to the victim, the defendant had a "grip" on her arm as he led her to his vehicle and that their departure was so hurried, she could not take her purse. Neither she nor the children had time to put on their shoes. While in his vehicle, the defendant struck the victim in her eye, forced her to perform oral sex, told her that he had "decapitated" her parents, and threatened "to lay [her] down beside them." According to the victim, the defendant transported her and her children to the defendant's brother's house, where they were forced to stay until the next day. Under these circumstances, it is our view that the evidence was sufficient to support the conviction for aggravated kidnapping.

## II. Testimony as to Prior Bad Acts

The petitioner next contends that the trial court erred by refusing to exclude evidence that the defendant had on a previous occasion threatened the victim and her brother because the evidence was inadmissible under Tennessee Rule of Evidence 404(b). The state submits that the "[d]efendant's violent history was offered . . . to establish why [C.F.M.] and [B.R.S.] didn't resist [the] [d]efendant's commands to quickly dress and get in the truck to leave with him."

Generally, the admission of evidence is a matter entrusted to the sound discretion of the trial court, and a trial court's ruling on an evidentiary matter will not be reversed absent abuse of that discretion.[2] State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004) (citing State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997)). On appeal, "[t]he abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State

---

[2]Donald F. Paine, distinguished adjunct professor at the University of Tennessee College of Law and reporter to the Tennessee Supreme Court Advisory Commission on Rules of Practice and Procedure, has criticized the "sound discretion of the trial court" standard, arguing that the admission of evidence is strictly governed by the Tennessee Rules of Evidence. Donald F. Paine, Evidentiary Nonsense, Tenn. Bar Journal, June 2005, at 15.

v. Coley, 32 S.W.3d 831, 833 (Tenn. 2000) (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999); State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Tennessee Rule of Evidence 404(b) provides as follows:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:
(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible. The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime. Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626, 646 (Tenn. Crim. App. 1994). Most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). That perhaps best explains the traditional posture of the courts that any testimony of other bad acts by a defendant is not usually admissible when used as substantive evidence of guilt of the crime on trial. Parton, 694 S.W.2d at 302-03. In those instances where the other conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases. State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

Unlike the Federal rule barring such evidence, our rule does not specifically enumerate the purposes for which such evidence may be offered. State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000). The Advisory Commission specifically omitted such a list so that lawyers and judges would "'use care in identifying the issues to be addressed by the Rule 404(b) evidence.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 404.6, at 169 n.457 (3d ed. 1995)). Therefore, in every case in which evidence of other crimes, wrongs, or acts is offered, the trial court should carefully scrutinize the relevance of the evidence and the reasons for which it is being offered. Id. Although Rule 404(b) does not explicitly list these exceptions, our courts have held that evidence of other crimes may be admissible to show motive, intent, guilty knowledge, identity of the

defendant, absence of mistake, and the existence of a common scheme or plan. See, e.g., Collard v. State, 526 S.W.2d 112, 114 (Tenn. 1975); see also Cohen, supra § 4.04[8] (4th ed. 2000). Even if the challenged evidence is relevant to an issue other than character, it must be excluded if the danger of unfair prejudice outweighs the probative value of the other crime evidence. Tenn. R. Evid. 404(b)(4); State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983).

During a hearing held outside the jury's presence, defense counsel agreed with the trial court that a "primary issue [was] whether there was a particular force, threat, or fraud used to accomplish the false imprisonment." After the hearing, the trial court determined that the defendant's prior violent acts toward the victim and her brother had been proved by clear and convincing evidence and were relevant to the defendant's motive and intent. The trial judge also found that the evidence had substantial probative value.

In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), our supreme court ruled that "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show [the] defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." 868 S.W.2d at 574 (citing State v. Turnbill, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982); State v. Glebock, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981)); see also State v. Hall, 958 S.W.2d 679, 707-08 (Tenn. 1997) (appendix).

In this case, the evidence showed that the defendant had committed prior acts of violence against the victim and that she had good reason to be afraid of him, explaining why they did not physically resist his command to accompany him to his vehicle. The evidence showed a history of anger on the part of the defendant when the victim tried to end their relationship. The evidence also demonstrated a related, settled intent to harm the victim, which was probative of the defendant's motive and intent in breaking into the victim's residence and kidnapping her and the children. See State v. Michael Lynn Stanton, No. E2003-02675-CCA-R3-CD, slip op. 9-10 (Tenn. Crim. App., at Knoxville, Apr. 15, 2005). In our view, the record demonstrates that the probative value of this testimony as to prior acts outweighed its prejudicial effect. This issue is without merit.

### III. Sentencing
### A. Length of Sentence

The defendant argues that the trial court erred by imposing the maximum sentences for each of his convictions and by ordering the kidnapping sentences to be served consecutively. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v.

Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If the trial court's findings of fact are adequately supported by the record, this court may not modify the sentence even if it would have preferred a different result. State v. Fletcher, 805 S.W.2d 785 (Tenn. Crim. App. 1991). The presumption of correctness is, however, "conditioned upon the affirmative showing in the record that the trial court considered sentencing principles and relevant facts and circumstances." Ashby, 823 S.W.2d at 169. The trial court must place on the record the reasons for the sentence. Jones, 883 S.W.2d at 599.

In sentencing the defendant, the trial court first acknowledged the sentencing guidelines and advised that it had reviewed the presentence report. The trial court imposed the sentences based on the following enhancing factors: (1) the defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range; (8) the defendant has a history of failing to comply with the conditions of a sentence involving release into the community; both of which the court gave great weight; and (3) the offense involved more than one victim, a factor to which less weight was given. See Tenn. Code Ann. § 40-35-114(1), (3), (8) (2003). The trial court did not find any mitigating factors. On appeal, the defendant does not challenge findings as to the enhancement factors but, instead, challenges the trial court's failure to find as mitigating factors that the defendant did not confine the victim and her children once they arrived at his brother's house and that he voluntarily released the victims.

In this case, the victim testified that while they were at the defendant's brother's house, the defendant said in a loud voice that he intended to kill her and twice asked for his brother's gun. Seeing a hammer, he threatened to "beat her head in" or tie her to the back of a truck and "pull her behind" it. Later, he took the victim into a bedroom, punched her after she refused to remove her clothes, and raped her. As for the claim that the defendant "released the victims alive," the victim testified that at her request, the defendant's brother contacted the police, who arrived while the defendant was sleeping. The police officers, not the defendant, freed the victims. Under these circumstances, it is our view that the trial court acted within its authority by imposing the maximum sentences.

## B. Consecutive Sentencing

In determining that the defendant's sentences for kidnapping should be served consecutively, the trial court noted that he had an extensive prior criminal history and was a dangerous offender. Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), our high court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

Taylor, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Comm'n Comments. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[3] exist:

> (1)  The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
> (2)  The defendant is an offender whose record of criminal activity is extensive;
> (3)  The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4)  The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5)  The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6)  The defendant is sentenced for an offense committed while on probation; or
> (7)  The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

---

[3] The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Comm'n Comments.

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1) (2003), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2) (2003); State v. Lane, 3 S.W.3d 456, 460 (Tenn. 1999).

In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The Wilkerson decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." Wilkerson, 905 S.W.2d at 938.

> The trial court ordered consecutive sentences on the following grounds:
> As to the concurrent or consecutive nature of [the sentences,] . . . . his record . . . dates back until he's eighteen.
>
> Much of that record, I will acknowledge, [relates to a suspended] . . . driver's license, . . . but, there are . . . prior assaultive convictions and actually . . . one evading and a separate resisting arrest . . . . I mean, he's continually having arrests and convictions. The main issue with the Court are these assaultive-type behaviors.
>
> But, I do think, based on the proof that I've heard, including the other uncharged activity which would be in the Court's mind [including] criminal activity involving weapons, he does have an extensive record from the point of criminal activity and/or convictions.
>
> I also do think, and this decision was only additionally supported by the proof here today from [the victim] about these threats on the day he was arrested, I do think that he is a dangerous offender that had little or no regard for his children or his wife. At that time, that day, she was . . . less than a human being. She was his. Whatever he wanted to do with her, he was gonna do and did much of it, the oral sex and the threats and the--calling her the various names.
>
> I doubt, according to [the victim], there was no one there, but, it really doesn't matter. I mean, in [the defendant's] mind, he's coming in and finding her with somebody. That person never surfaced. So, if there was somebody there, there's

some man out there that saw [the victim] being abused to the extent she was and just chose to never come back and inquire about anything.

But, regardless, [the defendant] just lost . . . control of himself, became enraged and treated her in a manner that's totally unacceptable and obviously against the law and degrading . . . . I think that indicates that he had little regard for her life and/or subjected her to conduct that placed her life at risk.

Along with that particular factor, I have to analyze what is the term of incarceration that should be imposed. Should there be consecutive sentencing based on the severity of the offenses and protecting . . . the public from any future harm . . . and that would include [the victim] and her children.

Based on that analysis, which is in the case of <u>State versus Wilkerson</u> . . . I mean, [the defendant] has through the testimony that I've heard, indicated little chance that he would be able to control his behavior at all. . . . But, his actions in the past through these other events from July of '03 and . . . the events that we've heard about here that he's being sentenced for . . . indicate to me that he would be a danger to [the victim] if he were to get out.

Now, maybe he . . . obviously, if he serves this sentence [he] would be released. All I can do here today is assure [the victim] that that's gonna be a long time from now.

So, based on those factors that I'm finding that he does have an extensive criminal activity and he is a . . . dangerous offender, the Court will run these sentences imposed in Counts One and Two consecutive with each other for [an] effective thirty-[seven-year] sentence and Count Three concurrent with the other two and that is at one hundred percent.

In determining that the defendant qualified for consecutive sentencing, the trial court found that an extended sentence reasonably related to the severity of the offenses and was necessary to protect the public against further criminal conduct by the defendant. Furthermore, the presentence report established that the thirty-three-year-old defendant had been convicted of evading arrest, two counts of aggravated assault, resisting arrest, two counts of aggravated domestic assault, an undefined offense, and six traffic offenses. His arrests, as an adult, began in 1991 when he was in his teens and occurred with regularity during the next thirteen years. Under these circumstances, it is our view that the trial court did not err by ordering the kidnapping sentences to be served consecutively.

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE